Douglass, Defendant in Error, v. Ritchie, Plaintiff in Error.

1. It is not sufficient to charge an owner of a slave for goods purchased and delivered to such slave, that the goods purchased were used by the slave for the benefit of the master with his assent.

*Error to Cooper Circuit Court.*

This was an action to recover the value of goods, wares, &c., alleged to have been " sold by plaintiff to defendant, and

by defendant, per boy Anderson, received of plaintiff and at the request of defendant." The following instruction was given to the jury at the instance of the plaintiff: "1. If the jury believe from the evidence that the account for which the plaintiff has sued in this case was made by Anderson ; and that at the time he made the account he was the slave of the defendant, or under his control either as slave or otherwise, and that the goods purchased of plaintiff were used by Anderson for the benefit of the defendant, with his assent, then they must find for plaintiff." Other instructions were given to the jury, but it is unnecessary to notice them. The defendant requested the court to instruct the jury as follows: " The selling of goods to a slave, without the consent in writing of the master, owner, or overseer of such slave first had and obtained, is contrary to the law of this state, and in this case, there being no evidence of such consent, the jury will find for the defendant."

A verdict was rendered for plaintiff.

*W. Douglass* and *Draffen*, for plaintiff in error.

I. The goods were sold to a negro slave without the consent in writing of the master, owner or overseer first had and obtained, and therefore illegal and void, and the courts will not enforce it. (R. C. 1845, tit. Slaves, p. 1018, § 33 ; Story on Agency, § 195, 235, note 2, 344, 345, 346, 347, note 3 ; Armstrong v. Toller, 11 Wheat. 250 ; Hannay v. Eve, 3 Cranch, 242 ; Hunt v. Knickerbocker, 5 Johns. 327 ; Graves v. Delaplaine, 14 Johns. 146 ; Griswold v. Waddington, 16 Johns. 438 ; Roberts v. Samuel, 17 Mo. 555 ; Ashley v. Dillon & Lester, 19 Mo. 619 ; 2 Kent, 458, 466, 467 ; 7 Mo. 585.) The penalty of the act implies a prohibition. (1 Kent, 467.)

II. The defendant could not make the negro slave an agent to act and deal as a free person. (R. C. 1845, tit. Slaves, p. 1014, § 7 ; Story on Agency, § 11, 240, 241.)

*Adams* and *Hayden*, for defendant in error.

I. Whether Anderson acted as the agent of Ritchie or not,

was a question for the jury, and they having found for the respondent, this court will not disturb their verdict.

II. The court very properly refused to give the last instruction asked for by the appellant. The evidence shows that Douglass did not deal with Anderson as the *slave*, but dealt with him as the *agent* of Ritchie. The dealing therefore in contemplation of law was with Ritchie, and not with Ritchie's slave. It was not necessary for Douglass to obtain the consent in writing of Ritchie to trade *with* Ritchie. Such a construction would be absurd. The object of the statute is to guard and protect slave property from vicious influences. Individuals are therefore prohibited from trading with, and treating them as free persons ; but it was never intended that a master should not constitute his slave his agent, nor to prevent a third person from trading with the master through his slave. That a master may constitute his slave his agent, see Christian v. Bowman et al. (1 Hill's S. C. R. ; Wheeler on Slavery, p. 228.)

LEONARD, Judge, delivered the opinion of the court.

The first instruction given at the instance of the plaintiff is erroneous. The facts stated in it do not entitle the plaintiff to recover. It is not sufficient for that purpose that the defendant was the owner of the slave, and that "the goods purchased were used by the slave for the benefit of his master and with his assent." Undoubtedly, if the goods were bought by the master, either by himself personally, or through the agency of his slave, and delivered to the slave by the master's direction, the latter would be liable ; and there could be no pretence in such a case ( one of daily occurrence in the community) either that it was a prohibited dealing with the slave or that the master was not liable. But the question is, do the facts stated in the instruction constitute such a transaction ? Does it follow because the slave, after obtaining the goods, applied them to his master's benefit, that the sale was in point of law to the master and not to the servant ? Or, in other words, do these

circumstances constitute a sale, made in fact with the slave, a contract in point of law with the master, imposing upon him the obligations contracted *de facto* by his slave. We all know that they do not. This is too plain for argument, and yet such seems to be the effect of the instruction given.

The difficulty, or rather the confusion of ideas that seems to exist here, grows out of the fact that the transaction was with a slave, and this renders it not improper to refer to the rules of law applicable to cases of this character.

Our American law of African slavery is a system of customary law, that is, of rules and principles applicable to the institution, at first introduced and observed by the people in their practical dealing with the subject, and subsequently recognized by the courts as the grounds of judicial decision. Very few of these principles are the result of written law, but have been developed from time to time by the actual working of the system in the several slave states, and successively adopted by the courts as they have been found by experience to be proper and effective in making the institution answer the purpose for which it exists. Our system of slavery resembles that of the Romans rather than the villenage of the ancient common law, and hence both the community and the courts have looked to the Roman rather than to the old common law of England for rules applicable to it. (Neal v. Farmer, 9 Georg. 555 ; Byrum v. Bostwick, 4 Dess. S. C. 266 ; Dulany's Opinion, 1 Har. & McHen. R. 561.) Under the former law, slaves were *things* and not *persons* ; they were not the subjects of civil rights, and of course were incapable of owning property or of contracting legal obligations ; they and all that appertained to them belonged to their master, and they were under his dominion. In a word, slavery was then defined to be " an institution by which one man is made the property of another," (Just. Inst. lib. 1, tit. 3,) and such undoubtedly is our African slavery ; and accordingly, the slave's incapacity to be the subject of civil rights—as to own property, or contract a legal obligation—which flows from the nature of the institution, is adopted by our

Douglass v. Ritchie.

people in practice and recognized in the decisions of our courts. Nevertheless, slaves may buy and sell, and make contracts *de facto*, although no civil rights result therefrom to themselves, and our statute law takes notice that such things are done, and, deeming it unwise to allow of them, prohibits a master from permitting his slave to deal as a free man, and all others from selling to or buying from a slave without the master's written consent. (R. C. 1845, tit. Slaves, art. 1, § 7, 33.) There was proof in this case tending to show that both parties had violated these laws—the defendant in allowing his slave to set up a shoemaker's shop and deal as a free man; and the plaintiff by selling to him the goods, the price of which he now seeks to recover against the master. The sale, it is admitted, did not vest any right to the goods in the slave, nor create any civil obligation against him to pay for them, and this results from the slave's incapacity, and not from the statute prohibition against selling to him. But, according to the Roman law, although a slave could not acquire any thing *for himself*, he could acquire *for his master ;* and in the case now before us a Roman master would have become the owner of the goods upon their delivery to the slave, although the promise to pay would not have bound him. (Just. Inst. tit. 9, lib. 2.) Whether the same change of ownership would result from such a transaction under our law (which seems to be the common opinion in reference to goods actually delivered to the slave, provided they are such as masters usually allow their slaves to enjoy), we are not now called upon to determine; but certainly no obligation arises under our law out of such a transaction against the master to pay the price, even if the slave use the goods for the master's benefit and with his assent. If a trespasser convert to his own use the goods taken, the owner may waive the trespass, and sue for the value of them, as for goods sold ; but that doctrine is not applicable to a case of this character ; and yet some such idea seems to have been in the mind of the defendant as a possible ground of recovery on the part of the plaintiff, and to have dictated the instruction he asked

in order to guard against it.   The plaintiff however insists upon nothing of the kind.   He states his cause of action in his petition distinctly to be " for goods sold to the defendant and delivered to his slave," and insists here in argument that it is quite immaterial whether the sale was to the master personally or through the agency of his servant, and this is undoubtedly true ; but that was not the instruction the court gave.   The jury were told in substance that the master was liable if the slave used the goods for the benefit of the master and with his assent, and certainly this is not the law, although it was no doubt the ground on which the recovery was had.

The case has not been properly tried.   The jury were mis-directed as to the law, and the judgment is therefore reversed, and the cause remanded.